## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARSHA McDEVITT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) CIVIL ACTION NO. 3:2005-166 |
| v. | ) |
| | ) JUDGE GIBSON |
| COMMONWEALTH OF | ) |
| PENNSYLVANIA DEPARTMENT OF | ) |
| CORRECTIONS - STATE | ) |
| CORRECTIONAL INSTITUTION AT | ) |
| CRESSON; JEFFREY BEARD, | ) |
| MICHAEL WOLLANIN; JOHN | ) |
| MARKEL; RAPHAEL K. CHIEKE; | ) |
| HARRY WILSON; MICHAEL KNOTT; | ) |
| ELIZABETH ECKENRODE; | ) |
| FREDERICK KNAB; DAVID | ) |
| JADLOCKI; DUANE A. HARRIS; | ) |
| PENNSYLVANIA STATE | ) |
| CORRECTIONS OFFICERS | ) |
| ASSOCIATION; SHAWN HOOD; | ) |
| DANIEL McNANY AND JOE FOX, | ) |
| | ) |
| Defendants. | ) |

# **MEMORANDUM OPINION and ORDER OF COURT**

## **GIBSON, J.**

This matter comes before the Court on Pennsylvania State Corrections Officers Association

("PSCOA" or "Union"), Donald McNany ("McNany"),[1] Shawn Hood ("Hood") and Joe Fox ("Fox,"

and together with McNany and Hood, "Individual PSCOA Defendants")'s Motion for Summary

Judgment (Document No. 46) and Commonwealth of Pennsylvania Department of Corrections - State

---

[1] Plaintiff's Amended Complaint incorrectly identified Donald McNany as "Daniel McNany."

Correctional Institution at Cresson ("DOC"), Jeffrey Beard ("Beard"), Michael Wollanin ("Wollanin"), John Markel ("Markel"), Raphael K. Chieke ("Chieke"), Harry Wilson ("Wilson"), Michael Knott ("Knott"), Elizabeth Eckenrode ("Eckenrode"), David Jadlocki ("Jadlocki"), and Duane A. Harris ("Harris" and together with Beard, Wollanin, Markel, Chieke, Wilson, Knott, Eckenrode, and Jadlocki, "Individual DOC Defendants")'s[2] Motion for Summary Judgment (Document No. 54). In accordance with the analysis herein, the Court will grant both motions for summary judgment.

## I.  Concise Statement of Undisputed Material Facts[3]

This action was commenced by Plaintiff, Marsha McDevitt ("Plaintiff" or "McDevitt") on March 3, 2005.[4] Plaintiff alleged violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 1983 and 42 U.S.C. § 1985, the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §§ 951-963 against [all Defendants].

At all material times, DOC was the [e]mployer of Plaintiff and the Individual DOC Defendants. At all material times, PSCOA was a labor organization representing for purposes of collective bargaining certain DOC employees in the H-1 bargaining unit, including Plaintiff. At no

---

[2]Although a DOC employee, defendant Frederick Knab is not included in the sub-class of Individual Commonwealth Defendants.

[3]The following facts are based upon PSCOA Defendant's Concise Statement of Undisputed Material Facts (Document No. 47), the Corrections Defendants' Concise Statement of Undisputed Material Facts (Document No. 56) and the Plaintiff's Responses (Document Nos. 74, 75), and the Plaintiff's Statement of Additional Material Facts (Document No. 74, 75), and the Defendants' responses (Document Nos. 76, 77).The submissions of the parties were used, while any additions to a proposed material fact in the record but not offered by the parties are indicated in brackets. Any proposed facts not contained within the following recitation of facts were found by the Court to remain disputed in the record or to be immaterial.

[4]An amended complaint was filed on or about June 3, 2005.

time was Plaintiff employed by PSCOA. For all relevant times, Defendant Hood was employed by PSCOA as a Business Agent. For all relevant times Defendant Fox was employed as a Corrections Officer by DOC. At the same time, he served as President of the local union at the State Correctional Institution at Cresson ("Cresson").

[At all times relevant to this action], Jeffrey Beard was employed as the Secretary of Corrections for the Commonwealth. Michael Wollanin and John Markel were employed as investigators for the Commonwealth. Raphael K. Chieke was employed as the Director of the Office of Equal Opportunity for DOC. Harry Wilson was employed as the Superintendent for SCI-Cresson. Michael F. Knott was employed as the Deputy Superintendent for Centralized Services and acting Superintendent for SCI-Cresson. Elizabeth Eckenrode was employed as the Human Resources Director for SCI-Cresson. Captain David Jadlocki was employed as a Corrections Officer and Intelligence Gathering Captain for SCI-Cresson. Defendant Duane A. Harris was employed as a Corrections Officer and Shift Commander at SCI-Cresson.]

Plaintiff claims that on December 27, 2003, she was sexually assaulted by Frederick Knab, a co-worker and PSCOA member. At the time, both Plaintiff and Knab were employed as Corrections Officers at Cresson. Knab hugged her, ground up against her and made indecent propositions to her – crimes for which he later pleaded guilty to the summary offenses of disorderly conduct and harassment. [Plaintiff testified that] Department of Corrections policy required that Knab be tested for alcohol intoxication, which he refused. When Plaintiff went to Harris, the Shift Commander at the time of the attack, to report it, [Plaintiff testified that] Harris said, "Marsha, you know that this thing is going to get ugly, don't you?" Following Plaintiff's report of the assault, Knab was immediately

3

suspended and then [later] fired by DOC [on February 4, 2004][for the serious violations of sexual harassment, violence and unacceptable conduct towards a fellow employee, and reporting for duty in an unfit condition.] The offenses for which Knab was terminated constituted a serious security risk, both to his fellow employees and inmates. [Officer Thomas testified] that Knab had also reported for duty while visibly intoxicated on several other occasions. Such intoxication while on duty [would be] likewise a serious security risk. Knab's conduct as described by Officer Thomas were violations of the DOC code of ethics.

As was its statutory and contractual obligation as Knab's collective bargaining representative, PSCOA filed a grievance protesting Knab's termination. In fact, it was the custom and practice of PSCOA to file grievances on all discipline cases at Cresson. The grievance on behalf of Knab was filed on February 4, 2004. Although the grievance was signed and served by Fox, it was authored by Hood. Following the filing of the grievance, Hood and Fox engaged in discussions with Cresson management personnel in an effort to secure Knab's reinstatement. One of the grounds for the grievance was Knab's lack of prior discipline. A step one grievance hearing was not held on the grievance because Fox approached Superintendent Wilson and Elizabeth Eckenrode to request that Knab be returned to work, and they cooperated in working out a "conditions of continued employment"[or COCE] agreement with him, which was agreed to prior to the time a step one hearing would have been scheduled. Knab returned to work subject to conditions designed to protect Plaintiff. Around this time, Plaintiff had expressed concerns about the Union's filing of this grievance on behalf of Knab. Hood was cognizant of these concerns and expressed the same during the negotiations of the conditions of Knab's return to work. Aware of the fact that Plaintiff was worried about the

4

prospect of working with Knab should he be reinstated, [Hood] suggested terms of reinstatement whereby Knab would never be permitted to work on the Plaintiff's regular shift. Such terms were incorporated into the COCE. Ultimately, Knab was returned to work after signing the COCE, which included requirements for treatment of alcohol and workplace violence. These terms were memorialized at the "Step One" grievance hearing held on March 15, 2004.[5]

Plaintiff strenuously objected to Knab's return to work. Within one week of the execution of the COCE, Plaintiff made a verbal request to Hood that a grievance be filed concerning Knab's reinstatement. The basis for the grievance as requested by Plaintiff was that "she didn't want Fred Knab to return to work."[Plaintiff alleges that it was also based on Knab's behavior after returning to work.] [In July of 2004], Hood informed Plaintiff that the Union had no legal basis for filing a grievance protesting its own member's return to work. He informed Plaintiff that the grievance had no merit and would not be filed. [Plaintiff and] Plaintiff's Husband, Michael McDevitt, [wrote an email on July 5, 2004 after the initial request to file a grievance that indicated that they were still concerned with Knab's return to work and with Knab's conduct after he returned to work]. [Before Plaintiff wrote the above email to McNany and Ed McConnell about assistance in filing a grievance based on Knab's return to work and post-return behavior], the issue was brought before the local union's "Grievance Review Committee." The participants in the Grievance Review Committee are members of the local union's executive board and sometimes Business Agent Hood. The Committee's purpose is to review potential grievances to review their merit; that is, to determine whether a

---

[5] Although the hearing took place in March, the COCE was not signed until April 13, 2004.

5

particular provision of the CBA has actually been violated. If a potential grievance is deemed meritless, it proceeds no further. If a grievance has already been filed that the Committee feels is lacking in merit, it will be withdrawn. The Committee reviews at least 150 grievances or potential grievances per year. By Hood's conservative estimate, approximately 10% to 20% are deemed to be without merit. At the meeting, the executive board discussed Plaintiff's grievance request [for Knab's return to work under the COCE] and made a determination that the grievance was not proper and would not be filed. This was communicated directly to Plaintiff. Likewise, no action was taken on Michael McDevitt's grievance.

When Plaintiff attempted to return to work [on July 1, 2004], she was [approached] by Superintendent Wilson, who attempted to persuade her to meet with Knab. Plaintiff became agitated at the prospect of confronting Knab and was seen [at the time] in the DOC infirmary with a nosebleed and blood pressure of 180/112. [Plaintiff] was referred by DOC nurse to physician follow-up the same day. Plaintiff utilize[d] all of her accumulated sick leave and [then went] onto unpaid leave [so that she would not have to return to work]. The incident of the nosebleed was not reported to DOC's worker's compensation carrier because Eckenrode and Wilson decided it was not related to her employment. [A worker's compensation claim had already been filed with regard to injuries stemming from the assault.]

On July 6, 2004[,] Jadlocki was notified that Knab was discussing confidential information about other officers, including Plaintiff, with inmates, telling the inmates that Plaintiff was a "bitch" who had "set him up." Jadlocki took no action on the reports, which included sworn statements from two DOC employees, because the inmates involved denied the reports. Knab, as early as June 20, 2004

6

and June 27, 2004, was [committing infractions warranting written documentation from other officers.] Plaintiff made numerous complaints regarding Knab's post-return conduct, including [continuing to] attempt to file a grievance.

On July 13, 2004, Plaintiff filed a complaint against PSCOA with the Pennsylvania Human Relations Committee ("PHRC"). In the complaint, Plaintiff accused PSCOA of sexual harassment, sexual discrimination and failure to provide union representation based upon discrimination in violation of the Pennsylvania Human Relations Act, 43 P.S. §§ 951-963. Specifically, Plaintiff alleged that the Union "refused to file my grievance against management because they were returning Fred Knab to work at the 2:00 p.m. shift which would cause me to come in contact with him whenever I worked over time [sic]." On or about July 21, 2004, Plaintiff filed a second PHRC complaint against PSCOA. In this complaint, Plaintiff alleged discrimination by the Union in failing to file a grievance on her behalf concerning her being forced to work mandatory overtime which caused her to come in contact with Knab. Additionally, she alleged retaliation by the Union in failing to file her grievance based upon the knowledge she suggests it possessed regarding the July 13th complaint. Also on July 21, 2004, Plaintiff personally filed a grievance against DOC, protesting, among other things, Knab's return to Cresson. On this same date, a grievance was filed by Michael McDevitt alleging the creation of a hostile work environment due to Knab's return to work. It is permissible for PSCOA members to file grievances on their own behalf, without the assistance of the Union.

Per contractual mandate, after a grievance is filed, it proceeds to "Step One" of the dispute resolution procedure. At the Step One hearing, the grievant and PSCOA representative(s) present the grievance to management personnel. If no amicable settlement is reached, the matter will proceed to

7

"Step Two" of the dispute resolution procedure contained in the CBA. While all grievants are entitled to a Union representative at Step One or Step Two hearings, they are not entitled to a Union representative of their choice. As a policy, an individual grievant has no discretion with respect to the Union representative present at their grievance hearings. However, [Hood testified that] prior to Plaintiff's grievance, no such request had ever been made. Thus, PSCOA had never been required to decline a request by a member to have a representative of their choosing. Plaintiff was, however, the first to make such a request. Because Fox and Hood had been named in the PHRC complaints, Plaintiff requested that different Union representatives assist her at the Step One hearing that had been scheduled. The Union refused this request. As such, Hood and Fox were present at Plaintiff's Step One hearing that took place on [the] July 21, 2004 [grievance].

The matter was not resolved and proceeded to Step Two hearing. In this step of the dispute resolution procedure outlined in the C BA, a joint-committee containing an equal amount of management and Union representatives hears the matter. There, the grievance can be settled or denied. Or, if the matter reaches a "deadlock," it will proceed to the third and final step of the procedure, grievance arbitration. The Step One hearing for Michael McDevitt's grievance was held on October 6, 2006. The matter was not settled and proceeded to Step Two. Plaintiff's Step Two hearing was held on November 24, 2004. Four PSCOA representatives appeared on behalf of Plaintiff: Hood, PSCOA employee Bill Parke and Business Agents Diane DeMarco and John Miller. Based upon the Commonwealth's procedural objection, the grievance was denied as being untimely filed. Michael McDevitt's grievance was heard at the Second Step on December 14, 2004. There, the Commonwealth raised the identical timeliness objection and the grievance was denied.

8

On November 23, 2004, Plaintiff was terminated from her employment [as a Corrections Officer 1] with DOC for violating DOC policy regarding fraternizing with inmates. During the spring and summer of 2004, while she was off work due to [mental and physical problems stemming from the assault by Knab], Plaintiff accepted three telephone calls from an inmate named Timothy Jones. During the periods after the attack by Knab when Plaintiff was working, she also presented Jones with four unsigned cards which were provided free for distribution to prisoners in the prison chapel. Plaintiff acknowledged that accepting the phone calls was against DOC policy. John Markel, an investigator from DOC's Office of Professional Responsibility, collected 40 cards and two letters from Jones' personal effects that Jones had received through the mail, some of which were signed "Tumesha". From the correspondence found in Jones' effects, Markel selected nine samples which he forwarded to a hired document examiner along with 6 samples of Plaintiff's writing. The examiner, based on the selected samples furnished by Markel, rendered an opinion that one unsigned letter was written by Plaintiff, but that the other samples, all in the same writing and signed "Tumesha", could not be attributed to Plaintiff. The examiner was not provided with samples of any comparators other than Plaintiff. Markel did not attempt to obtain exemplars from any of the women on Jones' phone or visitor lists to provide to the document examiner.

[DOC discovered] [Plaintiff's] address in Jones' effects during an unrelated search of his cell. The name of another C.O., one Clarence Johnson, also turned up this way. The prison's security captain, Jadlocki, already had him under surveillance for drug trafficking so he decided not to confront him with this evidence of potential fraternization. When questioned by Markel, Jones said he had Johnson's address because Johnson had offered to bring "smut books" into the institution for him.

9

Providing pornography to inmates is a violation of DOC's policy. DOC's OPR has police power and can obtain phone records. OPR was never asked to investigate Johnson, [because Johnson was under investigation internally by the security captain]. DOC did not refer the matter to the [State Police] until May of 2005. Once the matter was referred to them in May 2005, the State Police were able to commence their investigation and make an arrest by July 28, 2005. Johnson was fired by DOC and is facing criminal prosecution on serious drug felony charges.

Attachment #10 of the OPR report is a five (5) page handwritten signed statement in which plaintiff admits that she "succomed (sic) to inmate Jones in befriending him for protection; that she told him "I love you man, thanks for being there, no one else is" in response to him saying, "Go ahead and say it, tell me you love me"; that she had voluntarily accepted 3 phone calls from him during which they had conversations; as he requested, she twice called Jones' mother to inquire into her health; that she told him she loved him out of gratitude for his offer of protection. When Plaintiff was interviewed by Markel in September of 2004, she was still on sick leave due to the mental problems caused by her work situation, under the care of a physician, and [was taking] prescription medication. Plaintiff testified that on the day she signed the statement, she had taken Xanax and Prozac. Plaintiff did not refuse [the interview] or attempt to present her condition as an excuse not to give it. Markel thinks Plaintiff may have told him that she was on medications, but claims she was sufficiently coherent to proceed, although he has not had training in interviewing persons under the influence of drugs.

Then as now, Plaintiff [claims that her conduct] was the product of post-traumatic stress [disorder, which she had been diagnosed with by her psychologist], caused by [the assault] by Knab.

10

[Plaintiff claimed that his return], along with the way in which Captain Harris responded to her complaints about the assault, and the reactions of the individual defendants to her complaints about the assault and Knab's [behavior] that she claims extended from hostility to outright retaliation for her perceived temerity in this regard, [caused Plaintiff to have post-traumatic stress disorder, anxiety and depression leading to her behavior with regard to Jones]. She also emphasized her prior history of positive evaluations as a mitigating factor. DOC Director of the Bureau of Human Resources, Timothy Musser notified Acting Superintendent Hoover that upon review by Deputy Secretary Vaughn, his office and the Labor Relations Division[,] termination was the standard sanction for misconduct of the nature she had engaged in and without a written rationale for deviation approved by the deputy secretary it had to be levied and imposed. The [recommendation] to terminate Plaintiff was made by Wilson, Eckenrode, Hoover, and Knott. Prior to her termination, a pre-disciplinary committee composed of Eckenrode, Knott and Hoover held a conference at which Plaintiff was present with PSCOA representative Hood, and as a result of which the [recommendation] was made to terminate her. The committee members were aware that Plaintiff had filed an internal discrimination complaint with DOC on August 6, 2004. According to the report submitted by the committee to DOC's central office, the decision to terminate was based, in part, upon the conclusion that Plaintiff lied when she denied sending money orders to Jones because Jones claimed he had received money orders from her. [] Jones admitted that Plaintiff never told him she was sending him anything, [] and that he just assumed that they came from her. Jones also admitted under oath that he initiated correspondence to Plaintiff, that she never gave him her address or phone number, that she never indicated she would use the name "Tumesha" and that, in fact, he had a woman named Tumesha Bey on his visitor's list

11

who sent him letters. Jones further testified that he learned about Knab's assault on Plaintiff while she was off on sick leave because he overheard other guards talking about it including "one dude who made everybody hear it."

Hood [amended the September 21, 2004] grievance [initially filed with regard to Plaintiff's suspension] on behalf of Plaintiff in protest of her dismissal. Hood [testified that he] commenced efforts to attempt to get Plaintiff reinstated. He [testified that he] first made an information request. He [testified that he] then spoke to Elizabeth Eckenrode, Cresson's Human Resources Director to determine "what it would take" to get Plaintiff her job back. Hood also [testified that he] engaged in similar conversations with either the Deputy Superintendent or the Superintendent. [He testified that] all of his labors were aimed at "getting Ms. McDevitt returned back to work." [He testified that] his efforts were unsuccessful. [A Step One hearing was not held on Plaintiff's grievance]. [Even if there was no request from PSCOA], DOC could have voluntarily returned Plaintiff to work. The CBA contains a provision whereby a member has the right to process a grievance through the procedure contained in the contract itself, or through procedures governed by the Pennsylvania Civil Service ("Commission"). If an appeal is filed with the Commission, the grievance procedure will cease. Elizabeth Eckenrode testified that the grievance filed over Plaintiff's termination was ". . . never followed through." With the aid of outside counsel not affiliated with PSCOA, Plaintiff filed an appeal of her termination with the Commission. Accordingly, she requested that PSCOA withdraw the grievance they had filed on her behalf. The request to withdraw the grievance was made verbally to Hood. At his request, Plaintiff reduced the requested withdrawal to writing. PSCOA complied with this request and withdrew the grievance. No further action was taken on behalf of Plaintiff [by

12

PSCOA].

[Plaintiff] appealed her termination to the State Civil Service Commission. Following a hearing at which the parties were represented by counsel and the making of a record comprising 307 pages of transcript (that includes the testimony of both plaintiff and inmate Timothy Jones) the Commission issued a 42 Page Adjudication, making 89 specific findings of fact therein. The Commission concluded [that] her firing by DOC, under the circumstances that the Commission had found to exist, was for "just cause" and not the product of gender discrimination. *Inter alia*, the Commission found the Plaintiff wrote Jones a love letter whose salutation is "Hey Sweetie;" complied with his request to call his mother; and that she admitted that she had voluntarily participated in three telephone conversations (the product of 3-way phone calls) with Jones, that are characterized by the use of terms of endearment by both [Plaintiff] and Jones and by references by him to having received something from her and by her to having gotten something from him. (The phone conversations were lawfully recorded and were subsequently transcribed and added to the record of the proceedings.) Jones also sent a letter to his mother enclosing one to Plaintiff that makes reference to her dependability in sending him something that is otherwise unidentified. [Plaintiff] admitted in her testimony that she never lodged any written complaint or made a written report of her extramural contacts with Jones.

DOC itself [is] the adjudicator of Heart and Lung claim[s]. [Plaintiff claims that] the attorney, Keith Figured, Esquire, provided by PSCOA under the terms of the union contract to represent her in her claims for worker's compensation and Heart and Lung Act benefits misinformed her as to the process, applied duress for her to agree to a global settlement on the basis that his relationship to the

13

Commonwealth was more important tha[n] her interests, and informed her that if she would state her agreement on the record, she would still have the option of seeking other legal advice.

## II.    **Analysis**

### A.    **Summary Judgment Standards**

The following standards are applied in ruling upon a motion for summary judgment:

> Summary judgment is appropriate only when it is demonstrated that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-32, 106 S. Ct. 2548, 2552- 57, 91 L. Ed. 2d 265 (1986) ; Fed. R. Civ. P. 56(c). An issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). In deciding a motion for summary judgment, all reasonable inferences must be drawn in favor of the non-movant. Oritani [Sav. And Loan Ass'n v. Fidelity and Deposit Co., 989 F.2d 635, 638].

Troy Chem. Corp., v. Teamsters Union Local No. 408, 37 F.3d 123, 125-126 (3d Cir. 1994).

Federal Rule of Civil Procedure 56(c) states in pertinent part that judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

> As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. See generally 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2725, pp. 93-95 (1983). This materiality inquiry is independent of and separate from the question of the incorporation of the evidentiary standard into the summary judgment determination. That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs. Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry,

14

since materiality is only a criterion for categorizing factual disputes in their relation to the legal elements of the claim and not a criterion for evaluating the evidentiary underpinnings of those disputes.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202, 211

(1986).

Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. Adickes, 398 U.S., at 158-159, 90 S. Ct., at 1608-1609. Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial. Kennedy v. Silas Mason Co., 334 U.S. 249, 68 S. Ct. 1031, 92 L. Ed. 1347 (1948).

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 - 2514, 91 L. Ed. 2d 202,

216 (1986).

When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a *genuine issue for trial.*" Fed. R. Civ. P. 56(e) (emphasis added). Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-587, 106 S. Ct. 1348, 1356,

89 L. Ed. 2d 538, 552 (1986) (internal citations omitted) (footnote omitted).

## B.    Discussion

### 1.    Plaintiff's Complaint

Plaintiff's complaint comprises five counts. Count I asserts that DOC and PSCOA violated

the Federal Civil Rights Acts of 1964 by discriminating against, harassing, and retaliating against

15

Plaintiff because of her gender. Count II, once again brought against DOC and PSCOA, claims that the two defendants' actions against Plaintiff constitute sexual harassment, retaliation and sex discrimination under the Pennsylvania Human Relations Act (PHRA). Count III, brought under 42 U.S.C. § 1983 for violation of plaintiff's constitutional rights under the Fourteenth Amendment and Title VII against Frederick Knab, asserts that Knab's behavior toward plaintiff was discriminatory and caused her to suffer unwanted assaults. Count IV asserts claims of hostile work environment, discrimination, retaliation, and conspiracy under 42 U.S.C. § 1983 and 42 U.S.C. § 1985 for violations of Plaintiff's rights under the First and Fourteenth Amendments and her rights under Title VII and the PHRA by the Individual DOC Defendants. Count V was brought against the Individual PSCOA Defendants for failing and refusing to properly represent her as was required in the collective bargaining agreement in a discriminatory fashion, which Plaintiff claims violated her rights under the Fourteenth Amendment and Title VII and the PHRA subjecting the defendants to liability under 42 U.S.C. § 1983 and 42 U.S.C. § 1985. In a memorandum order dated October 18, 2006, the Title VII claims against the Individual PSCOA Defendants were dismissed because individual employees cannot be held liable under Title VII, but all other claims remain.

## **2.     Status of Claims Against DOC and Individual DOC Defendants**

The Corrections Defendants unnecessarily argue that DOC cannot be sued under § 1983. It is clear from Plaintiff's amended complaint and brief in opposition that she did not attempt to assert claims against DOC under § 1983. Therefore, the Corrections Defendants' arguments on this point are moot. Further, the Corrections Defendants assert that DOC is immune from suit for the count brought under the PHRA due to DOC being an entity of the state and therefore immune from suit in

16

federal court for money damages under the Eleventh Amendment. Plaintiff does not contest this argument and therefore, the PHRA claim against DOC is dismissed.

The Corrections Defendants make three further initial arguments with regard to the claims against them. The first asserts that Plaintiff did not name the Individual DOC Defendants in Count II, the count brought under the PHRA. However, Plaintiff claims that she put forth a PHRA claim in Count IV against the Individual DOC Defendants by incorporating the other paragraphs of the complaint into her Count IV claim. As stated above, this Court has already dismissed the Title VII claims against the Individual PSCOA Defendants and for the same reasons will now dismiss the Title VII claims against the Individual DOC Defendants. While Title VII claims cannot be brought against individual defendants who are not employers, the Court of the Appeals for the Third Circuit has held that for claims of aiding and abetting in a discriminatory practice under 43 PA. CONST. STAT. ANN. § 955 (e) of the PHRA, an individual can be sued under certain factual scenarios. Dici v. Com. of Pa., 91 F.3d 542, 552 (3d Cir. 1996). In the instant case, Plaintiff did incorporate the other paragraphs of her complaint into Count IV and also specifically claimed that the Individual DOC Defendants were "discriminatory and deprived Plaintiff of her constitutional rights under the First and Fourteenth Amendments, and her rights under Title VII, subjecting Defendants to liability under 42 U.S.C.A. §§ 1983 and 1985." (Plaintiff's Amended Complaint, ¶ 98). While Plaintiff made no specific mention of the PHRA in this Count and did specifically name the grounds for all other claims, pleading in Federal court is notice pleading and no specific statutory grounds need be stated as long as a claim is made out in Plaintiff's complaint. As such, the Court infers that Plaintiff intended to make out a PHRA claim against the Individual DOC Defendants. The Court will similarly infer that Plaintiff

17

intended to make out a PHRA claim against the Individual PSCOA Defendants as the claims against those defendants similarly incorporate the other paragraphs of the complaint.

The Corrections Defendants make a second argument with regard to the claims against the Individual DOC Defendants. They argue that the claims under § 1983 against the Individual DOC Defendants should be precluded by virtue of the prior adjudication of the State Civil Service Commission. In Edmundson v. Borough of Kennett Square, 4 F.3d 186 (3d Cir. 1993), the Third Circuit addressed issues of preclusion in cases where unreviewed agency determinations were argued to have preclusive effect in federal court. The Court summarized the law with regard to § 1983 claims as follows:

> When a prior case has been adjudicated in a state court, federal courts are required by 28 U.S.C. § 1738 to give full faith and credit to the state judgment and, in section 1983 cases, apply the same preclusion rules as would the courts of that state. Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 85-87, 104 S. Ct. 892, 898-99, 79 L.3d.2d 56 (1984) (claim preclusion); Allen v. McCurry, 449 U.S. 90, 95-105, 101 S. Ct. 411, 415-20, 66 L.Ed.2d 308 (1980) (issue preclusion). Decisions of state administrative agencies that have been reviewed by state courts are also given preclusive effect in federal courts. Kremer v. Chemical Constr. Corp., 456 U.S. 461, 479-85, 102 S.Ct. 1883, 1896-99, 72 L.Ed.2d 262 (1982). However, in section 1983 cases, only state administrative factfinding is entitled to preclusive effect in the federal courts when the agency ruling remains unreviewed by state courts. University of Tennessee v. Elliot, 478 U.S. 788, 799, 106 S. Ct. 3220, 3226, 92 L.Ed.2d 635 (1986). See infra pp. 192-93.

Id. at 189.

Defendants claim that rather than administrative fact-finding alone being entitled to preclusive effect in this case, the State Commission's conclusions of law should also be preclusive. In Edmundson, Civil Service Commission rulings were not reviewed in any state court in the case of the

18

termination of a police officer. Id. at 191. The Court of Appeals specifically addressed issue preclusion "as it might be invoked by defendants in their individual capacities as a result of the Civil Service adjudications in which plaintiff was a party, but the individual defendants were not." Id. In Edmundson, a Pennsylvania borough appointed a Civil Service Commission consisting of three commissioners under the Pennsylvania Borough Code. Id. The Third Circuit explained: "We see a profound difference in the ability of a Commission composed of lay citizens to resolve matters of credibility and fact–e.g., whether plaintiff actually made the statements in the circumstances alleged despite his denials–and the ability to determine the more complex question of whether the statements are constitutionally protected in accordance with the considerations articulated in Connick v. Meyers, 461 U.S. 138, 142, 103 S. Ct. 1684, 1687, 75 L. Ed. 2d (1983), and Pickering v. Board of Education, 391 U.S. 563, 88 S. Ct. 1731, 20 L .Ed. 2d 811 (1968)." Id. at 192. The Edmundson court further noted:

> As noted earlier, we do not think that an a dministrative agency consisting of lay persons has the expertise to issue binding pronouncements in the area of federal constitutional law. Our determination not to grant the Commission's ruling preclusive effect is based on the considerations listed in *Astoria*-the rights at stake, as well as the power and relative adequacy of state procedures in this highly specialized area. 501 U.S. at ----, 111 S.Ct. at 2170, see also Gjellum, 829 F.2d at 1064 (court must consider importance of federal rights and the "limited ability of the state forum to function as final adjudicator" in deciding if preclusion is appropriate); cf. Haring v. Prosise, 462 U.S. 306, 314, 103 S.Ct. 2368, 2373, 76 L.Ed.2d 595 (1983) (in section 1983 actions, "federal courts could step in where state courts were unable or unwilling to protect federal rights"). But see Nelson v. Jefferson County, 863 F.2d 18, 19-20 (6th Cir. 1988).

Id. at 193. In resolving Edmundson, the Third Circuit reversed the district court's favorable summary

judgment ruling for the individual defendants in their personal capacities. Id.

The Corrections Defendants argue that the decision to limit preclusive effect to administrative factfinding should depend on the make-up, capabilities, and professionalism of the board rendering the determination. Therefore, they contend that the State Civil Service Commission that rendered the decision in the instant case should be given preclusive effect with regard to their legal conclusions. In support of their argument, they cite to the composition,[6] competency,[7] and quasi-judicial function that they argue the Commission to possess. They argue, essentially, that the Edmundson ruling was not meant to extend to a body such as the State Commission.

This Court does not agree with Defendants' arguments in this regard. While the court of appeals may have discussed the specifics of the borough in Edmundson, the Commission in that instance was sitting in the same capacity as the State Civil Service Commission at issue in this case. Members in both were appointed without statutory requirements as to their qualifications. Both are quasi-judicial bodies serving quasi-judicial functions. Neither carries the status of a state or federal court. Despite the argued differences in "composition" and "competency" due to staff and other

[6]Defendants cite to 71 P.S. § 741.201, "(a) The State Civil Service Commission shall consist of three full-time members, not more than two of whom shall be of the same political affiliation, appointed by the Governor, with the advice and consent of a majority of the members elected to the Senate. Each appointment shall be for a term of six years or until a successor is appointed and qualified. The members of the commission shall hold no other public position to which a salary is attached. The Governor shall designate one of the members as chairman. No commission member shall hold any office or position, the duties of which are incompatible with his official duties."

[7]Defendants cite to 71 P.S. § 741.905a, "No officer or employee of the Commonwealth shall discriminate against any person in recruitment, examination, appointment, training, promotion, retention or any other personnel action with respect to the classified service because of political or religious opinions or affiliations because of labor union affiliations or because of race, national origin or other non-merit factors."

20

considerations, this Court finds that with regard to the federal civil rights at issue, a federal court is the best-equipped entity to make legal determinations. Therefore, the Court will only give preclusive effect to the factual findings of the Civil Service Commission with regard to Plaintiff's termination claims against the Individual DOC defendants under § 1983. However, the Court notes that the factual findings of the State Commission did not address any facts that did not specifically deal with Plaintiff's termination. Therefore, the Commission's factual findings can only be utilized with regard to Plaintiff's termination.

The Corrections Defendants make a final initial argument with regard to the Title VII claims against DOC. They claim that pursuant to a Heart and Lung Act settlement that was agreed upon before a hearing officer appointed by the Secretary of DOC, Plaintiff has waived her right to pursue Title VII claims against DOC. They argue that during a hearing before Edward S. Finkelstein on December 22, 2004, Plaintiff personally endorsed a settlement whereby she relieved DOC of any liability.

In Alexander v. Gardner-Denver Co., 415 U.S. 36 (1974), the United States Supreme Court addressed the issue of whether prior submission of a claim to final arbitration under the nondiscrimination clause of a collective bargaining agreement foreclosed the later right to a trial. The Supreme Court, while determining on its facts that no waiver had occurred, discussed an instance where the right to a later suit would be foreclosed:

> FN 15. In this case petitioner and respondent did not enter into a voluntary settlement expressly conditioned on a waiver of petitioner's cause of action under Title VII. In determining the effectiveness of any such waiver, a court would have to determine at the outset that the employee's consent to the settlement was voluntary and knowing. In no

21

event can the submission to arbitration of a claim under the nondiscrimination clause of a collective-bargaining agreement constitute a waiver with respect to an employee's rights under Title VII.

Id. at 52 n.15.

The Corrections Defendants contend that a discussion on the record between the attorney for DOC, Plaintiff's PSCOA attorney, Plaintiff, and the hearing officer effectively constituted a voluntary and knowing waiver of Plaintiff's Title VII claims. Defendants argue that Plaintiff "personally endorsed" the settlement agreement and therefore, the agreement is a valid waiver. See Bolden v. Septa, 953 F.2d 807, 825-26 (3d Cir. 1991). Corrections Defendants cite to the following portion of the transcript in support of their argument:

**Hearing Officer:**

You've heard the stipulation of Counsel. Do you agree with that?

**Ms. McDevitt:**

I agree with it.

**Attorney Kenny:**

Do you have any questions, ma'am? We're on the record. If you wanted to ask anything privately or on the record you're free to do so.

**Ms. McDevitt:**

So do we continue with the Workmen's (sic) Compensation or no?

**Attorney Figured:**

No.

**Attorney Kenny:**

No.

**Hearing Officer:**

No, ma'am. You can pursue your civil service appeal regarding your termination, but everything else has been resolved in this settlement, as far as I understand.

**Attorney Kenny:**

Correct.

**Attorney Figured:**

Does that answer all of your questions then?

**Ms. McDevitt:**

I think so.

**Attorney Figured:**

Yes?

**Ms. McDevitt:**

Yes.

\*\*\*

**Hearing Officer:**

Okay. All claims that she has against the Department of Corrections are resolved in this settlement?

**Attorney Kenney:**

That is correct. In all fairness, Mr. Figured was speaking to his client, Judge...

23

**Hearing Officer:**

All claims that your client has against the Department of Corrections, other than the Civil Service appeal, are resolved and settled in this agreement today. The only claims that she has – that she will have the right to pursue will be the civil service claims.

**Attorney Kenny:**

Right

\*\*\*

**Attorney Figured:**

Correct.

**Hearing Officer:**

Okay. And you understand that Ms. McDevitt?

**Ms. McDevitt:**

Yes sir.

\*\*\*

**Attorney Figured:**

And obviously that would be aside from any vested rights she has under her collective bargaining agreement towards retirement and so forth.

**Hearing Officer:**

Okay.

**Attorney Kenny:**

Right. (...)

**Hearing Officer:**

Okay. Close the record?

**Attorney Kenny:**

Yes, sir.

**Hearing Officer:**

Thank you.

(Corrections Defendants App. 9, pp. 10-13).

While Corrections Defendants claim that this discussion on the record constituted a full, voluntary, and knowing waiver of Plaintiff's Title VII claims, further discussion during the hearing clarifies that additional steps needed to be taken in order for the settlement to come to fruition, steps which Corrections Defendants have shown no evidence of ever taking place. The hearing transcript states as follows:

> **Attorney Kenny:**
>
> \*\*\*
>
> The Department has agreed to pay benefits pursuant to the Heart and Lung Act for two closed periods of disability. In exchange the Claimant will execute a Compromise and Release Agreement and a separate settlement agreement and general release with respect to the date of injury of 12/27/03, *so that once the settlement agreement is consummated, the Department will have no further liability* under the Worker's Compensation Act, Act 632, the Heart and Lung Act, the Equal Employment Opportunity Act, and the Pennsylvania Human Relations Act.
>
> The period of disability that the Department has agreed to pay is 3/17/04 through and including 5/14/04 and again from 7/1/04 through and including 11/22/04. Whatever Heart and Lung benefits are payable for those periods of time, *they will be paid once the Compromise and Release Agreement is approved by the Workers' Compensation Judge.*

25

\*\*\*

**Attorney Kenny:**

And we will have our Workers' Compensation attorney, Mr. Jim Mazzotta, prepare the Compromise and Release Agreement. Keith if you could please —.

**Attorney Figured:**

Well, it is already in litigation.

**Attorney Kenny:**

Right. Just notify the Judge and ask for a hearing.

**Attorney Figured:**

Yes, that won't be a problem. As soon as I receive the Compromise and Release Agreement and get that prepared, we just need to send him a letter and that will amend our Claim Petition to a Petition to Seek Approval of Compromise and Release and establish a hearing date.

**Attorney Kenny:**

All right.

(Corrections Def. App. 9, pp. 6-9) (emphasis added). The signing of a Compromise and Release Agreement and approval of that Agreement was a necessary part of the settlement and Plaintiff's waiver. Since there is no evidence that Plaintiff signed the Compromise and Release Agreement or that a hearing was scheduled with regard to seeking approval of that Agreement, this Court cannot conclude that the settlement was fully consummated and that Plaintiff waived her Title VII claims with regard to DOC. Plaintiff makes additional arguments in opposition with regard to the information she was given before and during the hearing and statements made by her attorney. The Court will not

26

discuss these arguments as it has already found that Plaintiff needed to sign the Compromise and Release in order to fully waive her claims.

### 3. TITLE VII/PHRA Claims against DOC and PSCOA

The Supreme Court recognized that it is often difficult for a plaintiff to prove that an employer acted with conscious intent to discriminate. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. E d. 2d 668 (1973) (setting up a judicial framework for employment discrimination cases that acknowledges difficulties of proof, and hence shifts certain burdens of proof from plaintiff to defendant). One manner in which a plaintiff can meet the ultimate burden of persuasion is by demonstrating that an employer's stated reason for the challenged action is not the true reason, but rather was a pretext for unlawful discrimination. Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 1093, 67 L. Ed. 2d 207, 215 (1981). In cases where there is no direct evidence of discrimination, such as this one, the Third Circuit applies the burden-shifting analysis set forth in McDonnell Douglas. See Barber v. CSK Distrib. Servs., 68 F.3d 694 (3d Cir. 1995). Under this analysis, a plaintiff must first establish a *prima facie* case of discrimination. McDonnell Douglas, 411 U.S. at 802, 93 S. Ct. at 1824, 36 L. Ed. 2d at 677; Burdine, 450 U.S. at 252-53, 101 S. Ct. at 1093, 67 L. Ed. 2d at 215. If the plaintiff successfully demonstrates a *prima facie* case of discrimination, the burden of production–but not the burden of persuasion–shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. Simpson v. Kay Jewelers, Div. Of Sterling, Inc., 142 F.3d 639, 644, n. 5 (3d Cir. 1998). The defendant can satisfy this burden by offering evidence of a nondiscriminatory reason for its action. Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994). Once the defendant offers a legitimate

27

nondiscriminatory reason for the challenged conduct, the plaintiff has the ultimate burden of proving by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but pretexts for discrimination. Jones v. School Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999).

### a.) *Prima Facie* Case

Title VII was enacted to prohibit employers from discriminating against employees with respect to compensation, terms, conditions, or privileges of employment.[8] Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 259, 101 S. Ct. 1089, 1096, 67 L. Ed. 2d 207, 219 (1981). To state a claim for discrimination under Title VII against DOC, Plaintiff must show by a preponderance of the evidence that: (1) she was a member of the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action despite being qualified; and (4) the employer treated an individual with qualifications similar to the plaintiff who was not a member of the protected class more favorably than Plaintiff. Scheidemantle v. Slippery Rock Univ., 470 F.3d 535, 539 (3d Cir. 2006). Plaintiff meets the first three elements of a *prima facie* case against DOC. Further, Plaintiff has provided evidence that Knab was treated more favorably during the termination process as he was reinstated pursuant to a COCE, while she was not. Knab possessed similar qualifications to Plaintiff and was not a member of the protected class. While the Court does not believe that the reasons for which Plaintiff, Knab, and Johnson were terminated are sufficiently similar to necessarily make them

---

[8] The Court's Title VII analysis applies equally to the PHRA claims. Scheidemantle v. Slippery Rock Univ., 470 F.3d 535, 539 (3d Cir. 2006) ("We construe Title VII and the PHRA consistently.") (citing Atkinson v. La Fayette College, 460 F.2d 77, 454 n.6 (3d Cir. 2006)").

similarly situated, the Court will proceed with the analysis, as "plaintiff's burden to establish a *prima facie* case is not onerous." Simpson v. Kay Jewelers, Division of Sterling, Inc., 142 F.3d 639, 646 (3d Cir. 1998).

Plaintiff also claims that she suffered several other adverse employment actions. She alleges that she was denied worker's compensation benefits and Heart and Lung benefits for her post-traumatic stress disorder. She has provided no evidence that any individual not of the protected class was treated differently in this regard. She also claims that she was removed from the Hostage Negotiation Team pending an "evaluation" due to the sexual assault but provides no evidence with regard to this allegation. Therefore, a *prima facie* case has only been established with regard to the Title VII discrimination claim for her termination.

The Court is satisfied that Plaintiff has made out a *prima facie* case with regard to her termination against DOC. However, PSCOA argues and the Court agrees, that Plaintiff has failed to make out a *prima facie* case with regard to her claims against PSCOA under Title VII and the PHRA. PSCOA was not Plaintiff's employer. Therefore, to recover on her Title VII discrimination claim against PSCOA, Plaintiff must show that "(1) the [union] breached the CBA with respect to her; (2) the union violated its duty of representation by permitting the breach to go unrepaired; and (3) there is some indication that the union's actions were motivated by a discriminatory animus." Tillman v. Pepsi Bottling Group, Inc., 538 F. Supp. 2d. 754 (D. Del. 2008).

With regard to the first requirement, Plaintiff argues that her Step 1 hearing on her individual claim was not timely held, if at all. She does not point to a CBA provision with regard to the timeliness of the Step 1 hearing. She only argues that the Step 1 hearing was held later than the July

29

21, 2004 date upon which PSCOA claims it was held. She claims that this somehow means that any untimely behavior of PSCOA was in breach of the CBA. However, Plaintiff does not indicate how such behavior breached the CBA. Plaintiff also generally claims that PSCOA breached the CBA in processing her individual grievance, but provides no further evidence in this regard.

Plaintiff further argues that the CBA provides that all grievances are to be presented in writing. She claims that the Defendants failed to produce a copy of a duly filed termination grievance in Plaintiff's behalf and endorsed by the receiving management official. However, PSCOA has provided a copy of Plaintiff's suspension/termination grievance. (PSCOA Appendix, Ex. 15). Plaintiff points to Article 35, Section 2, Step 1 of the CBA, which states that "The Employee, either alone, or accompanied by the Association Representative, or the Association Representative, where entitled, shall present the grievance in writing to the respective institutional/boot camp representative or official Agency designee within fifteen (15) working days of the date of the occurrence giving rise to the dispute, or when the employee knew or by reasonable diligence should have known of the occurrence." (PSCOA App., Ex. 2). This provision makes no mention of the grievance having to be signed by the receiving management official. While Plaintiff points out that Knab's grievance was endorsed as being received by management, Plaintiff has not shown that the grievance not being signed was a breach of the CBA.

It can be assumed that Plaintiff also argues that the failure of PSCOA to give her the representative of her choice was a breach of the CBA. However, Plaintiff points to no CBA provision in this regard and admits that no other member had ever made a similar request. Finally, Plaintiff claims that PSCOA's failure to file a grievance on her or her husband's behalf in July of 2004 was a

30

violation of the CBA. Plaintiff admits that the Union could not file a grievance based strictly on Knab's return but claims that she requested a grievance based not only on his return but also on his behavior after his return. In her deposition testimony, Plaintiff testified:

> On March 16 I had contacted Shawn Hood and asked him to file a grievance on my behalf and he stated that what can we file and what remedy are we asking because there isn't anything in the contract that would cover anything that you want to file upon. We discussed at great length what I felt needed to be done and nothing has ever happened.

(Plaintiff's Appendix, P-14, p. 100). As indicated by the date, this request for a grievance occurred before Knab's return to work, and hence could not have included claims regarding behavior after his return. Plaintiff further testified: "Then, I had spoken to, when Mr. Knab his first day coming back I had spoke to John Eckenrode, who is the local PSCOA, on what I could file and he said that he would get with the local executive board at that time. Mr. Eckenrode did not get back to me for exactly 15 days." (Plaintiff's Appendix, P-14, p. 100). Once again, Plaintiff points to the day that Knab returned, which cannot support a suggestion that she was also complaining about Knab's post-return behavior. On July 5, 2004, Plaintiff sent an email to PSCOA leadership stating:

> My husband Michael McDevitt, and myself have attempted to file a grievance for hostile work environment and disparity of treatment only to be informed today by Union Steward John Eckenrode, that the E-Board had found that the grievance lacks merit for filing.

(Plaintiff's Appendix, P-9, Exhibit 9). However, because she has not provided evidence that she spoke to Eckenrode between the day Knab returned and the day she sent the email and the executive board found that the grievance lacked merit, she cannot claim that they failed in not filing a grievance based upon the behavior of Knab after he returned.

31

Considering that Plaintiff presents only the above arguments with regard to the actual CBA, Plaintiff has failed to show that PSCOA breached the CBA with regard to her. Even if Plaintiff could show that the Union breached the CBA and then failed in its duty of representation by allowing the breach to go unrepaired, it is clear that Plaintiff has failed to meet the third requirement in this instance. Plaintiff has not provided any evidence that actions (or inaction) taken on her behalf by PSCOA were in any way motivated by her gender. Plaintiff did not provide any evidence that Knab's return and the actions of PSCOA during his return were motivated by gender-based animus towards Plaintiff. In fact, Plaintiff provided evidence that other grievances were treated similarly to her grievances, such as the grievance filed by her husband with regard to Knab's return. Such evidence is relevant because Plaintiff's husband is not a member of the protected class.

Further, while Plaintiff claims that PSCOA's refusal to provide Plaintiff with a representative of her choice was somehow based on her gender, Plaintiff has been unable to provide any evidence that any other grievants, male or female, were provided with their choice of representative. She further has been unable to provide any evidence that the actions taken during the grievance process with regard to her termination were in any way motivated by her gender. As a result, Plaintiff has failed to make out a *prima facie* case with regard to her gender discrimination claims against PSCOA and those claims will be dismissed.

### b.) DOC's Business Reason

Once a plaintiff has established a *prima facie* case the burden shifts to the defendant to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for legitimate and non-discriminatory reasons. Texas Dept. of Cmty. Affairs v.

32

Burdine, 450 U.S. 248, 254, 101 S. Ct. 1089, 1094, 67 L. Ed. 2d 207, 216 (1981). An employer

satisfies its burden of production by introducing evidence which, if taken as true, would permit the

conclusion that the adverse employment decisions occurred for non-discriminatory reasons. Fuentes

v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994); see also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502,

509 (1993). It is not necessary for the defendant to persuade the court that it was actually motivated

by the reason which it offers. Burdine, 450 U.S. at 254, 101 S. Ct. at 1094, 67 L. Ed. 2d at 216; see

also Bd. of Trs. of Keene State Coll. v. Sweeney, 439 U.S. 24, 25, 99 S. Ct. 295, 295, 58 L. Ed. 2d

216, 218 (1978).

In the instant case, DOC provided a legitimate business reason for Plaintiff's firing: that

Plaintiff fraternized with inmate Jones. Plaintiff admitted to having fraternized with inmate Jones via

phone and correspondence. Therefore, DOC's reason is facially valid and Plaintiff must provide

evidence of pretext.

### c.) Pretext

The last part of the analysis requires that, "[o]nce the employer answers its relatively light

burden by articulating a legitimate reason for the unfavorable employment decision, the burden of

production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the

employer's explanation is pretextual (thus meeting the plaintiff's burden of persuasion)." Fuentes, 32

F.3d at 763. Once the employer has stated a legitimate, non-discriminatory reason for the adverse

employment action, the plaintiff, in order to survive summary judgment, must satisfy at least one of

the two prongs articulated by the Third Circuit in Fuentes:

[T]he plaintiff must point to some evidence, direct or circumstantial,

33

from which the fact-finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

Id. at 764.

### 1. Prong 1

A plaintiff must submit some evidence that could cause a reasonable fact-finder to discredit the employer's articulated reason for the adverse employment action in order to overcome summary judgment and bring her case to trial. To discredit the employer's articulated reason, the plaintiff does not need to produce evidence that necessarily leads to the conclusion that the employer acted for discriminatory reasons. Sempier v. Johnson & Higgins, 45 F.3d 724, 764 (3d Cir. 1995). Furthermore, a plaintiff does not need to produce additional evidence beyond her *prima facie* case. Fuentes, 32 F.3d at 764. However, a plaintiff must demonstrate:

> weaknesses, implausibilities, inconsistencies, incoherencies [sic], or contradictions in the employer's proffered legitimate reasons [such] that a reasonable fact-finder could rationally find them 'unworthy of credence'" and hence infer that the proferred nondiscriminatory reason "did not actually motivate" the employer's action. [Fuentes, 32 F.3d] at 764-65 (quoting [Ezold v. Wolf, Block, Schorr, and Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992)]).

Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 644 (3d Cir. 1998).

The question asked in prong one of the Fuentes test is not whether the employer made the best, or even a sound, business decision; instead, the question is whether the real reason for the adverse result suffered by the plaintiff is discrimination. Keller v. Orix Credit Alliance, 130 F.3d 1101, 1109 (3d Cir. 1997). The court is neither permitted to get involved in the subjective business decisions of

34

the employer, nor set its own employment standards for the employer, unless there is evidence of discrimination. Ezold, 983 F.2d at 527. "An employment decision that would create a problem under prong one will likely turn on whether the stated reason for termination is so implausible that a fact-finder could not believe it [to be] worthy of credence." Orenge v. Veneman, Civ. No. 04-297, 2006 WL 2711651, at * 15 (W.D. Pa. Sept. 20, 2006); see Menta v. Cmty. Coll. of Beaver County, 428 F. Supp. 2d. 365, 374 (W.D. Pa. 2006).

Plaintiff's argument in response to her termination turns on her claims that she was suffering from post-traumatic stress disorder and was taking medications and hence could not be held accountable for her fraternization with inmate Jones. She makes similar medical claims to explain the statement she gave to Markel. Further, she suggests that she turned to inmate Jones for protection from Knab as she felt that she could not find it elsewhere and that it was Jones who first contacted her, taking advantage of her compromised position. Plaintiff suggests that this explanation belies the fact that her termination was "absolutely required."

Plaintiff admits in her counter-statement of material facts that she "accepted three telephone calls from an inmate named Timothy Jones." (Document No. 74, ¶ 28). She also admits that "[d]uring the periods after the attack by Knab when Plaintiff was working, she also presented Jones with four unsigned cards which were provided free for distribution to prisoners in the prison chapel." (Document No. 74, ¶ 29). Plaintiff, "acknowledged that accepting phone calls was against DOC policy . . ." (Document No. 74, ¶ 30). Plaintiff also attempts to discount much of the rest of DOC evidence against her by questioning the validity of their handwriting analyst and providing the testimony of Jones suggesting that he was only assuming that certain items that he received were coming from

Plaintiff. (Document No. 74, ¶¶ 31-35, 49-52).

Plaintiff has also provided evidence of her diagnosis. A letter from her psychologist, Heide Sedwick, states, "This letter is to confirm that the above individual is under my care for her condition of post-traumatic stress disorder (309.81), acute . . . Officer McDevitt continues to experience the effects of PTSD namely anxiety, stress as well as affective discomfort (high levels of anxiety and depression), flashbacks, intrusive thoughts that have negatively interfered with her quality of life in all spheres." (Plaintiff's Appendix, P-6 - Deposition Exhibits).

Despite Plaintiff's claims of illness, this Court does not believe that the evidence she has provided makes the reasons provided by DOC for firing her and not reinstating her "so implausible that a fact-finder could not believe it [to be] worthy of credence." Orenge, 2006 WL at *15. Plaintiff admits to fraternizing with Jones. She does not argue that she did not, but instead tries to downplay her behavior through claiming that she did not initiate the behavior and that she could not be held accountable for her state of mind at the time. Plaintiff has provided evidence of her diagnosis with PTSD, however, her psychologist's letter does not suggest that the disease affected Plaintiff's sense of right and wrong to a point where she would believe that her behavior towards Jones was appropriate. Further, Jones denied that he ever offered Plaintiff protection, nor would she have needed it when he allegedly initiated contact while she was outside the prison on sick leave. Therefore, DOC's legitimate reason with regard to Plaintiff's firing has not been sufficiently called into question under prong one.

## 2.    Prong Two

The court must next examine the second prong of the Fuentes framework to determine if

36

plaintiff presented sufficient evidence of pretext. To show that discrimination was more likely than not a cause for the employer's adverse actions, a plaintiff must point to evidence with sufficient probative force that would allow a fact-finder to conclude by a preponderance of the evidence that the protected characteristic was a motivating or determinative factor in the employment decision. Simpson, 142 F.3d at 644-45. Relevant evidence in the evaluation of this prong includes: (1) whether the employer has previously discriminated against the plaintiff, (2) whether the employer has discriminated against other people within the plaintiff's protected class or within another protected class, or (3) whether the employer has treated more favorably similarly situated persons not within the protected class. Id. at 645.

### a. Evidence of previous discrimination against plaintiff

Plaintiff points to her termination by DOC as one instance in an alleged repeated pattern of harassing, discriminatory acts. Plaintiff alleges that the pattern of discrimination began on December 27, 2003 when she was assaulted by Knab. Plaintiff cites to the sworn statement of Cecere, who reported that on the night of the incident when Plaintiff went to report the assault, Harris stated, "Marsha, you know that this thing is going to get real ugly, don't you?" (Plaintiff's Appendix, P-2). In her Amended Complaint, Plaintiff also claims that Harris demanded that she physically demonstrate what happened in the presence of seven male officers, and that Harris repeatedly asked her if she realized how serious the charges were. (Document Number 46, ¶¶ 44-46). She also claims that she was required to make a statement, but not allowed to do so until 12:00 p.m., although the incident occurred at 6:07 a.m. (Document No. 46, ¶ 43). She asserts that such a delay was against DOC policy. Id. Finally, Plaintiff claims that she should have been given a medical examination, counseling, or

37

a psychological assessment before she left that day pursuant to Department Policy. (Document No. 46, ¶ 47). Plaintiff has not provided further evidence with regard to the accusations in ¶¶ 43-47 of the Amended Complaint; as this is the summary judgment stage, accusation is not enough.

Plaintiff has further provided evidence that in July of 2004, when she returned to work, she developed a nosebleed after Wilson attempted to persuade her to meet with Knab when he returned to work. (Plaintiff's Appendix, P-6, Ex. 4; P-7, pp. 34-40). Plaintiff claims that she was denied paid leave, worker's compensation benefits, Heart and Lung benefits and other benefits as a result of improper paperwork being submitted or improper determinations being made with regard to this incident and her health problems generally. However, in her deposition testimony, she admitted that even though the worker's compensation paperwork was not complete the first time, the application was still denied when she re-filed it with all of the proper paperwork. (Plaintiff's Appendix, P-14, p. 41). Additionally, she has presented two reports by Corrections Officers that were given to Jadlocki, reporting that inmates were overheard discussing a conversation they had with Knab. The conversation that was allegedly overheard pertained to Knab telling the inmates that Plaintiff was a "bitch" who had "set him up." (Plaintiff's Appendix, P-9, pp. 38-42). Plaintiff admits that no action was taken on the reports because the inmates involved denied them. (Plaintiff's Appendix, P-19, Ex. 6-8).

Plaintiff alleges that all of this evidence taken together amounts to a pattern of discrimination that would show by a preponderance of the evidence that her gender was a motivating and determining factor in the employment decisions made. The Court does not believe that the evidence cited by Plaintiff makes this required preliminary showing. Many of Plaintiff's contentions amount to mere accusation. Furthermore, Plaintiff's evidence does not build a sufficient case for gender-related

38

discrimination. As such, Prong Two is not established by evidence of other discriminatory acts.

### b. Whether the employer has discriminated against other people within plaintiff's protected class.

Plaintiff makes one claim with regard to other women at CSI-Cresson being discriminated against. In her brief, she states, "Knab was permitted to make slanderous and sexist comments to inmates directed against Plaintiff and other female employees." (Document No. 69, p. 14). However, Plaintiff does not provide evidence that Knab in fact made any comments about or towards other female employees. Plaintiff points to the sworn statement of her husband in support of this allegation. However, his statement reads, "On 7/6/04, I received a phone call from CFSI R. Howell; he said to me that 2 inmates were talking in the back kitchen area about my wife and other employees. He stated that Officer Knab was talking to these 2 inmates and about other staff working on B-block." (Plaintiff's Appendix, P-10). The statement does not indicate whether the "other employees" or "other staff" were male or female nor does it provide evidence that the statements were sexist. As a result, prong two is not established, as no evidence of discriminatory acts against other protected class members has been put forth.

### c. Whether the employer has treated more favorably similarly situated persons not within the protected class.

Plaintiff points to two of her fellow corrections officers, Knab and Johnson, as male individuals similarly situated, but treated more favorably than herself. The Court's assessment of both individuals finds them insufficiently similarly situated to justify Plaintiff's attempted comparisons.

One individual raised by Plaintiff for comparison purposes is Clarence Johnson, who was fired for trafficking drugs. Johnson's information was found along with Plaintiff's when Jadlocki searched

39

inmate Jones' cell. Johnson was the subject of an ongoing investigation for drug trafficking within the prison. Following the discovery of information regarding Johnson and Plaintiff, Plaintiff was investigated for fraternization while Johnson was not. Here, Plaintiff's argument ignores the fact that DOC's final treatment of Johnson, termination without reinstatement, was the same as Plaintiff's treatment. With Johnson, DOC was concerned with a more serious violation than fraternization, the introduction of drugs onto the premises. Plaintiff was not the subject of an ongoing serious investigation that would have justified non-action. Therefore, with regard to Johnson, Plaintiff fails to make a sufficient argument that Johnson was more favorably treated.

Plaintiff also attempts to compare herself to Knab, who was fired for his intoxication on the job and his behavior towards Plaintiff. Plaintiff argues that Knab was reinstated pursuant to a COCE, and was not fired again for statements he allegedly made to inmates pertaining to Plaintiff. Plaintiff further argues that she was treated differently than Knab in that he was reinstated while she was not. Plaintiff acknowledges that she pursued a different process in appealing her termination, with Knab following a grievance process while she terminated her grievance and proceeded through a Civil Service appeal. Plaintiff nonetheless argues that DOC could have reinstated her regardless of the administrative process that she undertook.

In Simpson v. Kay Jewelers, Division of Sterling, Inc., 142 F.3d 639, 646 (3d Cir. 1998), the Third Circuit recognized that at the *prima facie* stage of a claim, a plaintiff can meet his or her burden simply by showing that one individual was treated disparately based on a few generalized factors. However, this framework does not generally apply in the pretext stage where "the factual inquiry into the alleged discriminatory motives of the employer has risen to a new level of specificity." Simpson

142 F.3d at 646 (internal citations omitted). "[T]here still must be evidence from which to infer discrimination apart from the fact that some members of one group are sometimes treated better and sometimes treated worse than members of another group." Id.

Upon examination of all available information, the Court concludes that Plaintiff does not provide adequate evidence that any other similarly situated individuals were treated differently. Knab was fired for a reason wholly different from the reason for which Plaintiff was fired. This distinction is compounded by Knab not being charged with the same offense as Plaintiff, and not following the same grievance procedure. As the offenses were different, Plaintiff had as much in common with Johnson, who was also fired without reinstatement, as with Knab. The Court does not believe that Knab is a sufficient comparator and therefore finds that prong two is not met. Therefore, Plaintiff is unable to support a claim for gender discrimination, and is also unable to present a claim for hostile work environment based on the evidence she has presented with regard to her gender discrimination claims.[9]

### d.) Retaliation/Hostile Work Environment Claims against PSCOA and DOC

Retaliation claims brought under Title VII and the PHRA follow the framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Jalil v. Avdel Corp., 873 F.2d 701, 706 (3d Cir. 1989); Fasold v. Justice, 409 F.3d 178, 188 (3d Cir. 2005); Williams v. Philadelphia

---

[9]In order to bring a claim for hostile work environment with regard to a gender discrimination claim, a plaintiff must demonstrate that:
> (1) [she] suffered intentional discrimination because of [her] sex; (2) the
> discrimination was pervasive and regular; (3) the discrimination detrimentally
> affected [her]; (4) the discrimination would detrimentally affect a reasonable
> person of the same sex in that position; (5) the existence of respondeat
> superior liability."

Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990). Applying this framework to this case, Plaintiff McDevitt cannot show that she suffered intentional discrimination because of her sex.

Hous. Auth. Police Dep't., 380 F.3d 751 (3d Cir. 2004). To establish a *prima facie* case of retaliation, plaintiff must demonstrate that 1) she engaged in protected activity (i.e. filing a claim with the EEOC); 2) defendant took adverse employment actions against her, and 3) there was a causal connection between the adverse action and her protected activity. Fogelman v. Mercy Hosp., 283 F.3d 561 (3d Cir. 2002). To establish a causal connection, plaintiff must show either temporal proximity between the protected activity and the adverse employment action, or evidence of ongoing antagonism. Abramson v. William Paterson College of N.J., 260 F.3d 265, 288 (3d Cir. 2001).

It is undisputed that Plaintiff engaged in protected activities with regard to DOC including filing two EEO complaints, one on January 20, 2004 and one on August 6, 2004, and an EEOC complaint on June 25, 2004. Plaintiff also filed PHRC complaints against the Union on July 13, 2004 and July 21, 2004. The court will therefore evaluate each of plaintiff's allegations of retaliatory adverse actions with respect to the second and third elements of the *prima facie* case. Plaintiff generally alleges that she suffered from a pattern of adverse actions starting from the time of the assault by Knab. Plaintiff further alleges that the ongoing and continuous retaliations materialized into a hostile work environment.

Recently, the Supreme Court has clarified what a plaintiff must show to satisfy the second prong of a retaliation claim under Title VII. Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006). In the context of a retaliation claim, a plaintiff is not required "to show an 'adverse employment action' that 'alters the employee's compensation, terms, conditions, or privileges of employment, deprives him of her employment opportunities, or adversely affects his or her status as an employee.'" Moore v. City of Philadelphia, 461 F. 3d 331, 341-42 (3d Cir. 2006) (quoting

42

Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997)). Likewise, employees claiming retaliation by harassment and a hostile work environment are not required to show harassment that "was 'severe or pervasive enough to create a hostile work environment' that would violate the anti-discrimination provision of Title VII in order to violate Title VII's protection from retaliation." Id. (quoting Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006).

In Burlington Northern, the Supreme Court distinguished the statutory language and purposes of the discrimination and retaliation provisions of Title VII and determined that the retaliation provision "is not limited to discriminatory actions that affect the terms and conditions of employment." Burlington N., 548 U.S. at 62-63. The Supreme Court concluded that "[t]he scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." Id. at 64. The Supreme Court articulated a new standard and held that a plaintiff claiming retaliation under Title VII must show that a reasonable employee would have found the alleged retaliatory actions "materially adverse" in that they "well might have dissuaded a reasonable person from making or supporting a charge of discrimination." Id. at 65. In explaining a "materially adverse" action, the Supreme Court noted the importance of separating "significant from trivial harms" and went on to explain:

> Title VII, we have said, does not set forth "a general civility code for the American workplace." Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80 (1998); see Faragher, 524 U.S. at 788 (judicial standards for sexual harassment must "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing'"). An employee's decision to report discriminatory behavior cannot immunize the employee from those petty slights or minor annoyances that often take place at work and that all employees experience. See 1 B. Lindemann & P. Grossman, Employment Discrimination Law 669

43

> (3d ed. 1996) (noting that "courts have held that personality conflicts at work that generate antipathy" and "snubbing' by supervisors and co-workers" are not actionable under §704 (a)). The antiretaliation provision seeks to prevent employer interference with "unfettered access" to Title VII's remedial mechanisms. Robinson, 519 U.S. at 346. It does so by prohibiting employer actions that are likely "to deter victims of discrimination from complaining to the EEOC," the courts, and their employers. Id. And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence. See 2 EEOC 1998 Manual §8, p 8-13.

Id. at 68.

In the instant case, Plaintiff alleges several instances that she claims were retaliatory. Plaintiff claims that DOC failed to submit proper documentation to the Worker's Compensation Board on her behalf and the claim was then denied. She also claims that she was denied Heart and Lung benefits because DOC claimed that her PTSD did not happen in the course of Plaintiff's employment. Further, Plaintiff claims that she was fired in retaliation for her complaints and that the internal investigation surrounding her firing was rife with the intimidation of witnesses, the solicitation of false testimony, and attempts to obstruct the internal affairs investigation. Plaintiff claims that in retaliation for the filing of her PHRC complaints against PSCOA, she and her husband's individual grievances were not properly processed and that after her termination, she was not properly represented by the Union.

Plaintiff's claim that inappropriate behavior occurred during the internal investigation of her firing fails to provide sufficient evidence that the alleged conduct constitutes an adverse employment action. The issue with respect to the other actions is whether plaintiff presented sufficient evidence of the third element, a causal link, between her protected activity and the adverse action by her employer. With respect to the existence of a causal link between the employee's protected activity and the employer's adverse action, two main factors are relevant: (1) timing and/or (2) evidence of

44

ongoing antagonism. Abramson v. Wm. Patterson Coll. of N.J., 260 F.3d 265, 288 (3d Cir. 2001) ("Temporal proximity . . . is sufficient to establish the causal link. [A] plaintiff can [also] establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period.")

The first prong requires a close temporal proximity between the protected activity and the adverse employment action. Id. While the Third Circuit has not enumerated a stringent formula for what is considered to be too long of a gap between the protected activity and adverse action, courts have held that a time span of several months is too great. See Williams v. Philadelphia Hous. Auth., 380 F.3d 751, 760 (3d Cir. 2004) (two months too long to permit an inference of causation.); George v. Genuine Parts Co., No. 04-108, 2007 U.S. Dist. LEXIS 5373 at *34-35 (W.D. Pa. Jan. 25. 2007) (holding that though suggestiveness is highly sensitive to the facts of each case, that a three-month gap "is not so close as to be unusually suggestive of retaliatory motive, especially where an obvious and unimpeached non-retaliatory motive exists.").

The Third Circuit has been somewhat ambivalent with respect to whether timing alone is sufficient to satisfy the causation prong of the *prima facie* case. See Woodson v Scott Paper Co., 109 F.3d 913, 920-21 (3d Cir. 1997) ("Temporal proximity is sufficient to establish the causal link."); Jalil v. Avdel Corp., 873 F. 2d 701 (3d Cir. 1989) (causal link established where plaintiff discharged two days following employer's receipts of the plaintiff's EEOC claim); but cf. Krouse v. American Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997) (causation prong not established on timing alone where 19 months passed following protected activity and adverse employment action: "Even if timing alone could ever be sufficient to establish a causal link, we believe that the timing of the alleged

45

retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred.") (quoting Robinson v. City of Pittsburgh, 120 F.3d 1286, 1302 (3d Cir.1997)); Quiroga v. Hasbro, Inc., 934 F.2d 497 (3d Cir. 1991) (affirming lower court's determination that the timing of the plaintiff's discharge alone did not raise an inference of retaliation). Timing, however, in connection with other types of suggestive evidence, is clearly sufficient to demonstrate the causal link. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280-281 (3d. Cir. 2000). For example, the Court of Appeals held that timing combined with evidence of vague or inconsistent reasons given by an employer for an employee's termination was sufficient to satisfy the causation prong of the *prima facie* case. Abramson, 260 F.3d at 289 ("Here, as we found in our discussion of the discrimination claim, [plaintiff] has succeeded in both casting doubt on the reasons [her employer] proffered for her termination, and in demonstrating that those reasons were vague and inconsistent."); Waddell v. Small Tube Prods., Inc., 799 F.3d 69 (3d Cir. 1986): see also EEOC v. L.B. Foster Co., 123 F.3d 746, 753-54 (3d Cir. 1997).

With regard to DOC, Plaintiff filed her first EEO complaint in January of 2004 and an EEOC complaint on June 25, 2004. Plaintiff testified that at first her Worker's Compensation claims were denied due to faulty paperwork filed by DOC. (Plaintiff's Appendix, P-14, p. 41). She has not provided exact dates with regard to her Worker's Compensation denials. She also has not pointed to specific dates with regard to her Heart and Lung claim denials by DOC. There may be some inference that can be drawn that her denials occurred in the period between January and June or after June based on letters from Plaintiff's doctors. One letter was from June 29, 2004 by Plaintiff's psychologist stating "unfortunately Officer McDevitt's Worker's Compensation was denied and she had to return

46

to work when she was out of sick days and vacation." (Plaintiff's Appendix, P-6, Deposition Ex. 2). Plaintiff also received a letter from Wilson dated July 22, 2004 stating that she was going to be put on unpaid sick leave. (Plaintiff's Appendix, P-15). However, the Court does not believe that this is sufficient evidence to establish that Plaintiff's denials were sufficiently close in time to her filings to meet the proximity requirement.

Additionally, Plaintiff was fired on November 24, 2004 and her last EEO complaint was on August 6, 2004. Therefore, four months separated the complaint from the firing. The Court does not believe that this is an unusually suggestive time frame; the court also notes, though, that claims of retaliation under Title VII follow the McDonnell Douglas analysis, and while DOC presents the same business reason for Plaintiff's firing here as it did with its claims of discrimination, Plaintiff has not adduced any evidence that DOC's business reason was pretextual. The timing alone in this case is insufficient to create an inference of causation. See Krouse, 126 F.3d at 503 (3d Cir. 1997) ("[T]he timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred.."). Therefore, the court must look to the "entire record before us" to determine whether the causation element is met, and weigh such factors as intervening antagonism, retaliatory animus, and inconsistencies in the employer's articulated reasons for the adverse employment actions. Farrell, 206 F.3d at 280-84. The Court finds that Plaintiff has not provided sufficient evidence with regard to retaliatory animus or intervening antagonism; therefore, the Court will dismiss the retaliation and hostile work environment claims against DOC.

With regard to the retaliation claims against PSCOA, Plaintiff filed her PHRC complaints on July 13, 2004 and July 21, 2004. The grievances of both Plaintiff and her husband were denied for lack

47

of timeliness on November 24, 2004 and December 14, 2004, respectively. Representation of Plaintiff by PSCOA for her termination occurred in the period from November 23, 2004 to January 11, 2005, when her request for the withdrawal of her grievance was confirmed. (PSCOA Appendix, Exhibit 11). Therefore, four months had passed between the protected activity and Plaintiff's denial, almost five months had passed between the protected activity and Plaintiff's husband's denial, and four months had passed between the complaints and the beginning of her post-termination representation. The Court finds that these time frames are not unusually suggestive in terms of proximity.

The Court also finds that Plaintiff has not adduced sufficient evidence of intervening antagonism or retaliatory animus on behalf of PSCOA. PSCOA suggested that the reason Plaintiff and her husband's individual grievances were denied was that they were untimely filed. PSCOA also suggested that the reason Plaintiff's termination grievance did not come to fruition was that Plaintiff withdrew it. Plaintiff has not adduced evidence beyond mere speculation that these reasons were not legitimate. Plaintiff admits that she withdrew her grievance, citing reasons of conflict of interest. (PSCOA Appendix, Ex. 3, pp. 155-159). To the extent that Plaintiff provides evidence that Knab was treated differently in the grievance process, the Court once again finds that Plaintiff was not similarly situated to Knab. As such, Plaintiff cannot support claims for retaliation or hostile work environment against PSCOA.

### d. Section 1983 and § 1985 Claims Against All Individual Defendants

Section 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities

48

> secured by the Constitution and laws, shall be liable to the party injured
> in an action at law, suit in equity, or other proper proceeding for redress
> ...

42 U.S.C. § 1983. "Section 1983 is not itself a source of substantive federal rights." Gallo v. City of

Philadelphia, 975 F. Supp. 723, 727 n. 5 (E.D. Pa. 1997), rev'd on other grounds, 161 F.3d 217 (3d

Cir. 1998) (citations omitted). Rather, it provides only remedies for deprivations of rights established

elsewhere in the Constitution or federal laws." Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).

Plaintiff claims that she was denied equal protection under the Fourteenth Amendment by the

Individual PSCOA and DOC Defendants and denied her First Amendment rights by the Individual

DOC Defendants. For claims under the Fourteenth Amendment:

> ... no State shall "deny to any person within its jurisdiction the equal
> protection of the laws." U.S. Const. amend. XIV, § 1. This is
> essentially a direction that all persons similarly situated should be
> treated alike. *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432,
> 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). In order to bring a
> successful section 1983 claim for the denial of equal protection,
> plaintiffs must prove the existence of purposeful discrimination.
> *Andrews v. City of Phila.,* 895 F.2d 1469, 1478 (3d Cir.1990) (citing
> *Batson v. Kentucky,* 476 U.S. 79, 93, 106 S.Ct. 1712, 90 L.Ed.2d 69
> (1986)). In other words, they must demonstrate that they received
> different treatment from that received by other individuals *similarly
> situated. Id.* (citing *Kuhar v. Greensburg-Salem Sch. Dist.,* 616 F.2d
> 676, 677 n. 1 (3d Cir.1980)). Specifically, to prove sexual
> discrimination, a plaintiff must show that any disparate treatment was
> based upon his gender. *Id.* (citing *Bohen v. City of East Chicago,* 799
> F.2d 1180, 1186-87 (7th Cir.1986))

Shuman *ex rel.* Shertzer v. Penn Manor School Dist., 422 F.3d 141, 151 (3d Cir. 2005).

For claims of protected activity under the First Amendment:

> ...constitutional retaliation claims are analyzed under a three-part test. Plaintiff must prove (1) that he engaged in constitutionally-protected activity; (2) that the government responded with retaliation; and (3) that the protected activity caused the retaliation. Anderson v. Davila, 125 F.3d 148, 161 (3d Cir.1997) (public employee retaliation); Rauser v. Horn, 241 F.3d 330, 333 (3d Cir.2001). The threshold requirement is that the plaintiff identify the protected activity that allegedly spurred the retaliation.

Eichenlaub v. Township of Indiana, 385 F.3d 274, 282 (3d Cir. 2004).

The Court finds that Plaintiff has not adduced any separate or distinct evidence from that which she presented for her claims against PSCOA and DOC in her claims against all of the Individual Defendants, except for one letter that Plaintiff sent to the Secretary of Corrections, Jeffrey Beard, requesting his assistance in dealing with her discrimination claims. (Plaintiff's Appendix, P-13). Plaintiff explains that Beard responded that she should pursue her issues through the proper channels. This correspondence cannot possibly lead to a reasonable inference that Beard should have intervened in Plaintiff's case, or that a failure to do so was discriminatory or retaliatory. Therefore, as Plaintiff could not make out a claim for gender discrimination and for retaliation for her above claims, she cannot make them out against any particular individual here.[10]

With regard to claims under 42 U.S.C.A. § 1985, a legal action under § 1985 is available for the victim of a conspiracy formed "for the purposes of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities

---

[10]Plaintiff's claims against the individual defendants under the PHRA would be similarly construed to those above.

50

under the laws." 42 U.S.C. § 1985 (3). To support a claim under § 1985, Plaintiff must be able to show:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprive of any right or privilege of a citizen of the United States.

Farber v. City of Paterson, 440 F.3d 131 (3d Cir. 2006) (quoting United Bhd. of Carpenters & Joiners v. Scott, 463 U.S. 825, 828-29, 103 S. Ct. 3352, 77 L. Ed. 2d 1049 (1983)). The Court cannot find that Plaintiff has adduced evidence of a conspiracy or any kind of concerted discriminatory action between the Individual PSCOA Defendants and the Individual DOC Defendants, or between the Individual PSCOA Defendants and PSCOA and the Individual DOC Defendants and DOC.

## III. Conclusion

For the reasons stated herein, the Motion for Summary Judgment filed by PSCOA Defendants and the Motion for Summary Judgment filed by DOC Defendants are granted. The Court notes that this opinion does not relate to any of the claims Plaintiff has against Frederick Knab.

An appropriate Order follows.

51

**AND NOW**, this 29th day of September 2008, in accordance with the foregoing Memorandum Opinion, IT IS HEREBY ORDERED THAT the Correction Defendants' Motion for Summary Judgment (Document No. 54) is GRANTED in its entirety and PSCOA Defendants' Motion for Summary Judgment (Document No. 46) is GRANTED in its entirety.

**BY THE COURT:**

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**